Argued and submitted January 10, reversed and remanded for new trial
February 23, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## KELLY LEE STILES,
*Appellant.*

## (Z448573; CA A102471)

998 P2d 703

David J. Celuch argued the cause and filed the brief for appellant.

Holly A. Vance, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Defendant appeals from his conviction for driving under the influence of intoxicants. ORS 813.010. He asserts, in part, that, because the accusatory instrument did not allege the use of controlled substances, the court erred in instructing the jury that he could be convicted of driving under the influence of a combination of marijuana and intoxicating liquor. We agree with defendant that the challenged instruction conflicted with ORS 813.010(2). Accordingly, we reverse and remand for a new trial.

On the evening of September 7, 1997, Portland Police Officer Bell stopped defendant for running a stop sign. When Bell approached defendant, he smelled alcohol on defendant's breath. Because Bell has allergies, he usually cannot detect the odor of alcohol unless it is "pretty strong."

A second officer, Peterson, arrived. Bell told Peterson that he believed that defendant might be intoxicated and asked for his assessment. Peterson spoke with defendant and smelled a "strong odor" of alcohol. He perceived that defendant's eyes were watery and bloodshot. Defendant told Peterson that he had had a "couple of beers." At Peterson's request, defendant agreed to perform several field sobriety tests. Defendant passed the "finger-to-nose" test but had some difficulty with the "finger-count" and "backwards-counting" tests. Throughout his interactions with Peterson, defendant was "extremely jittery," and "wouldn't quit talking." Peterson ultimately concluded that defendant was under the influence of intoxicants.

While Peterson spoke with defendant, Bell contacted a third officer, Wyatt, who was more experienced in DUII investigations. When Wyatt arrived, he too spoke with defendant and detected a "moderate" odor of alcohol on defendant's breath. Defendant's speech was moderately slurred and he swayed while speaking with Wyatt. Wyatt described defendant's eyes as watery and bloodshot, with "red streaking." At trial, Wyatt testified concerning the significance of the red streaking in defendant's eyes:

"Based on what I've been told and what I've observed, I find that people who are under the influence of alcohol often

have watery eyes that—that are bloodshot. I find that people that are under the influence of marijuana get really red-streaked eyes more than just a little red bloodshot, but really red-streaked eyes, and that indicates to me that a person is under the influence of marijuana."

At Wyatt's request, defendant performed—or attempted to perform—three additional field sobriety tests. First, on the horizontal gaze nystagmus test, defendant demonstrated a lack of "smooth pursuit"—his eyes "jerked" and "kind of ratcheted"—and was unable to complete the balance of the test because he could not keep his feet together with his arms at his side, while looking straight ahead. Because Wyatt believed that defendant's red-streaked eyes indicated marijuana use, he then administered the "lack of convergence" test. Wyatt described that test and its significance at trial:

"The lack of convergence test is a test that I've been taught to administer that tests for the presence of marijuana in a person's system. And with the lack of convergence test, the test is real simple, standing in the same position as the horizontal gaze nystagmus test, looking straight ahead, feet together, holding a pen out a ways so they can focus on it, bring the pen slowly down to their nose with them keeping their eyes on it. You'll find as they do this, their eyes cross just as mine do (indicating), bring it all the way down and touch the nose, the eyes should cross.

"* * * * *

"I did the test three times. I even called Officer Peterson over to show him because I know that most officers don't have a chance to observe that phenomenon. It's real distinct. I didn't believe it when they told me. After I did it on the street and found it numerous times, I've developed reliability on that test.

"* * * * *

"Each time as I brought the pen down, [defendant] started to cross his eyes. They got to a certain point and then they bounced in opposite directions all three times indicating that he had distinct lack of convergence. His eyes couldn't cross and that indicates to me he's under the influence of marijuana."

After administering the "lack of convergence" test, Wyatt asked defendant when he smoked marijuana last, and defendant responded "I used to grow it for 10 years, but I stopped. I haven't smoked it in a long time."

Finally, Wyatt administered the "walk-and-turn" test. Defendant could not "stand heel to toe for more than about two seconds" without losing his balance, swaying, and nearly falling. Throughout his interaction with Wyatt, defendant was agitated, "just nonstop movement, nonstop fidgeting and jerking around and talking." Defendant's demeanor fluctuated from cooperative and "apologetic" to "very hostile."

Wyatt concluded that defendant was "obviously under the influence of intoxicants" and arrested him. The Uniform Traffic Citation alleged, without elaboration, a violation of "ORS 813.010"/"DUII."

An ensuing inventory of the pickup that defendant had been driving yielded several empty Busch beer cans in the pickup's bed and one unopened can of Busch beer in the cab. Defendant refused to submit to an Intoxilyzer test.

The case was tried to a jury.[1] The state presented testimony by Bell, Peterson, and Wyatt, including Wyatt's testimony pertaining to marijuana use. Defendant did not object to that marijuana-related testimony. At the close of the state's case, defendant moved for a judgment of acquittal, asserting that: (1) Under ORS 813.010(2),[2] the jury could not convict defendant of driving under the influence of a controlled substance (marijuana) because the Uniform Traffic Citation did not specifically allege use of a controlled substance; and (2) the evidence was insufficient to support a conviction for an "alcohol-only" DUII.

The court denied defendant's motion, concluding that there was sufficient evidence from which the jury could find that defendant drove under the influence of intoxicating liquor. Thereafter, at defendant's request, the court instructed the jury, in accordance with ORS 813.010(2), that:

---

[1] Before trial, defendant unsuccessfully moved to suppress the results of the field sobriety tests as being nonconsensual.

[2] The text of ORS 813.010(2) is set out below. 165 Or App at 590.

"A person may not be convicted of driving under the influence of intoxicants on the basis of being under the influence of a controlled substance unless the fact that the person was under the influence of a controlled substance is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

The balance of the court's instructions consistently framed the jury's inquiry in terms of determining whether defendant had driven under the influence of "intoxicating liquor" and did not refer to use of controlled substances.

During deliberations, the jury asked the following questions:

"In judging 'impairment' must it have been from alcohol alone, or can impairment have been the result of the other controlled substances?/Is the charge for alcohol only?"

Defendant argued that the court should respond that the evidence concerning defendant's alleged marijuana use was immaterial to the jury's consideration—*i.e.*, that, given the allegations of the accusatory instrument, the state was limited under ORS 813.010(2) to proving an "alcohol-only" DUII and was foreclosed from prevailing on a combined "alcohol-plus-marijuana" theory. The court disagreed, concluding that, under *State v. Huck*, 100 Or App 193, 785 P2d 785 (1990), the state could rely on such a "combined" DUII theory.[3] Consequently, the court answered the jury's question:

"Driving Under the Influence of Intoxicants includes, 'Is under the influence of intoxicating liquor and a controlled substance.' The defendant is charged with Driving Under the Influence of Intoxicants."

The jury then convicted defendant.

On appeal, defendant assigns error to (1) the denial of his motion for judgment of acquittal; (2) the court's response to the jury's question regarding consideration of defendant's alleged marijuana use; and (3) the denial of

---

[3] The state did not assert that defendant's marijuana use made him more "susceptible" to the effects of alcohol. *See, e.g., State v. Miles*, 8 Or App 189, 492 P2d 497 (1972). Indeed, the court found, and the state expressly acknowledged, that the state had failed to establish the foundation for a *Miles* instruction in this case. Thus, no *Miles*-related issue is presented here.

defendant's pretrial motion to suppress the results of the field sobriety tests. We reject, without further discussion, defendant's challenge to the denial of the suppression motion. As amplified below, however, we conclude that, although the court properly denied defendant's motion for judgment of acquittal, it erred in responding to the jury's inquiry.

Our resolution of the first and second assignments of error turns on the proper relationship between subsections (1) and (2) of ORS 813.010—and, particularly, on the meaning of the phrase "on the basis of being under the influence of a controlled substance" in subsection (2). Because the second assignment of error focuses the inquiry more cogently, we begin with it.

ORS 813.010 provides, in part:

"(1)  A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a)  Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

"(b)  Is under the influence of intoxicating liquor or a controlled substance; or

"(c)  Is under the influence of intoxicating liquor and a controlled substance.

"(2)  A person may not be convicted of driving under the influence of intoxicants on the basis of being under the influence of a controlled substance unless the fact that the person was under the influence of a controlled substance is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

Here, the trial court informed the jury that, although the accusatory instrument charged "DUII" generically, without reference to use of a controlled substance, the jury could, nevertheless, consider evidence of defendant's alleged marijuana use in determining whether defendant had violated ORS 813.010. The correctness of the court's response depends on the content of the phrase "on the basis of being under the

influence of a controlled substance" in subsection (2). If that phrase refers solely to "controlled substance-only" DUIIs—and does not encompass "combined" DUIIs—then the court's response was correct. That is, the jury could consider defendant's alleged marijuana use and convict defendant for a "controlled substance-and-alcohol" DUII even though the accusatory instrument did not refer to controlled substances. Conversely, if the critical statutory language also encompasses "controlled substance-and-alcohol" DUIIs, then the court's response was erroneous because it allowed the jury to consider defendant's alleged marijuana use notwithstanding that the accusatory instrument did not allege such use.[4]

In construing the critical language of ORS 813.010(2), we follow the analysis prescribed in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). The parties' arguments highlight two plausible constructions of the text. The state asserts that the language must pertain solely to "controlled substance-only" DUIIs because it does not refer to controlled substances *and alcohol*—and for the court to construe the statute to encompass "combined" DUIIs would be to impermissibly "insert what has been omitted by the legislature." ORS 174.010. Thus, in the state's view, if a defendant had one beer and then smoked a quantity of marijuana that would, by itself, be sufficient to culpably impair the defendant, then the jury could convict on a "combined" DUII theory, even if marijuana use was not alleged in the accusatory instrument. Conversely, defendant contends that the phrase "being under the influence of a controlled substance" reasonably, and necessarily, encompasses all circumstances in which use of a controlled substance materially contributes to culpable impairment.[5]

---

[4] None of our decisions materially pertains to, much less resolves, the question presented here. *See, e.g., State v. Smelcer*, 148 Or App 225, 230, 939 P2d 154 (1997) (where accusatory instrument did not allege use of a controlled substance, *and there was no evidence that the defendant had consumed alcohol*, the defendant could not be convicted on the basis of driving under the influence of controlled substances); *Huck*, 100 Or App at 196 (decided *before* enactment of ORS 813.010(2): person could be convicted of driving under influence of intoxicants based on consumption of combination of alcohol and Vicodin; state was not required to present evidence that "a controlled substance is *capable* of impairing a person's mental and physical abilities * * * [That] is a question for the trier of fact.") (emphasis in original).

[5] We note that there is, at least, a third plausible construction: "being under the influence of a controlled substance" could refer to all circumstances in which,

Reference to statutory context does not resolve the textual ambiguity. Indeed, we discern no contextual clues. We proceed, then, to the legislative history of ORS 813.010(2).

ORS 813.010(2) was enacted in 1991, Or Laws 1991, ch 835, § 7, as part of omnibus legislation[6] overhauling Oregon's laws pertaining to suspension of licenses for driving under the influence of intoxicants. The legislative history of that bill, which was proposed by Citizens for a Drug Free Oregon, shows that the legislation was enacted in response to federal highway funding legislation. *See* Tape Recording, Senate Committee on Judiciary, HB 2585 § 7, June 26, 1991, Tape 244, Side B (comments of committee counsel, Ingrid Swenson). That federal legislation provided for withholding five percent of highway funding from any state that did not suspend the licenses of persons driving "under the influence of such a [controlled] substance." *See* 23 USC § 159 (a)(3), (c)(2)(B) (1998). As the Judiciary Committee's counsel explained, under then-current Oregon law, driving under the influence of intoxicants was charged generically without reference to the particular intoxicant involved. Thus, if a person drove under the influence of a controlled substance, then neither the charging instrument nor the conviction would, necessarily, describe the crime as one involving the use of controlled substances. Section (7) of the Oregon legislation—now ORS 813.010(2)—was designed to comply with the federal suspension mandate by insuring that persons convicted of driving under the influence of controlled substances were, in fact, identified as such, triggering the required suspension. Thus, ORS 813.010(2) is, at base, a record-keeping or "tracking" mechanism:

> "And what [section (7) of HB 2585] does is require in the prosecution * * * of a driving under the influence case, for the state to allege and prove [that] the driver was under the influence of controlled substances. Currently, these cases are prosecuted as driving under the influence of intoxicants, and the jury can convict based on evidence showing that there might be drugs and alcohol, one or the other, or

---

regardless of whether defendant also consumed alcohol, the use of the controlled substance was independently sufficient to produce culpable impairment.

[6] HB 2585 (1991).

both, and no specificity is required. And in order to limit the application of this suspension to those persons who are driving under the influence of controlled substances to comply with the federal act, it will be necessary for that distinction to be made." Tape Recording, Senate Committee on the Judiciary, June 26, 1991, Tape 244, Side B (statement of Ingrid Swenson).

Given that the purpose of the Oregon legislation was to comply with the federal mandate, the phrase "under the influence of a controlled substance" in ORS 813.010(2) necessarily incorporated the same content as the parallel phrase in the federal legislation. The issue thus reduces to what Congress intended that language to encompass. *See State v. Cooper*, 319 Or 162, 168, 874 P2d 822 (1994) (legislative history of federal statute is persuasive in interpreting state statute derived from federal statute, citing other Oregon authority).

██ The history of the underlying federal legislation, the "Drug Offender's Driving Privileges Suspension Act of 1990,"[7] demonstrates that Congress intended the operative language to be read broadly. As described by the Senate Committee on Environment and Public Works, that legislation was a public safety measure designed to get drug users off the road:

"Purposes of Bill

"The legislation has two primary goals: (1) deterrence of illegal drug activity, and (2) promotion of highway safety.

"*Deterrence*—There is an urgent need to reduce illegal drug activity across the nation and to deter those who would engage in such activity. License suspension is a cost-effective, practical way to deter illegal drug activity, particularly for young persons, for whom driving privileges are highly valued. A Gallup poll found that 57 percent of teenagers and 49 percent of adults surveyed believe that telling

---

[7] The "Drug Offender's Driving Privileges Suspension Act of 1990" was first enacted as section 333 of the Department of Transportation and Related Agencies Act of 1991, Pub L 101-516, § 333, 104 Stat 2184-2186 (1990). The following year, Congress repealed that section and simultaneously reenacted it as section 333 of the Department of Transportation and Related Agencies Act of 1992, Pub L 102-143, § 333, 105 Stat 944-47 (1991), *codified as amended* at 23 USC § 159 (1998).

students they would not get their licenses would be a 'very effective' deterrent.

"In 1988, West Virginia enacted a related statute that provides for the suspension of driver's licenses of students who drop out of school. Subsequently, the dropout rate was reduced by about one-third.

"*Highway safety*—While the extent of the drugged driving problem is not known with certainty, there are strong indications that it is a serious threat to highway safety. According to one witness, Dr. Kimball Maull, four out of ten drivers injured in an accident showed traces of illegal drugs.

"A January 1990 study by researchers at the New York Hospital-Cornell Medical Center and the Office of the Chief Medical Examiner in New York found that one of every four drivers killed in New York City traffic accidents tested positive for cocaine use. The study focused on drivers between the ages of 16 and 45 and covered the years 1984 through 1987.

"Preventing users of illegal drugs from driving should reduce accidents and save lives." S Rep No 101-298, 101st Cong, 2d Sess (1990), 2.[8]

In accordance with that legislative history, we conclude that the phrase "being under the influence of a controlled substance," as used in ORS 813.010(2), necessarily encompasses all cases in which the state contends that the defendant's use of a controlled substance materially contributed to culpable impairment. Consequently, unless the accusatory instrument alleges the use of a controlled substance, the state is precluded from relying on a "combined" DUII theory. Here, the court's response to the jury's questions violated that statutory prohibition—it permitted the jury, without the requisite allegation in the charging instrument, to consider

---

[8] The committee's report further explained:

"Witnesses discussed the problem of casual drug use; the effectiveness and appropriateness of Federally-imposed incentives and sanctions, the status of efforts at the Federal, State, and local levels of government to reduce drug-related offenses; and legal and administrative considerations in tying driving license revocation or suspension to drug convictions." S Rep No 101-298, 101st Cong, 2d Sess (1990), 6.

evidence of defendant's alleged marijuana use and to convict defendant of a "combined" DUII. That was error.

■ Before addressing the proper disposition, we return, briefly, to defendant's second assignment of error, which challenges the court's denial of his motion for judgment of acquittal. Defendant contends that he is entitled to outright reversal because the evidence, as submitted to the jury, was insufficient to prove an "alcohol-only" DUII. We disagree. Excluding proof of marijuana use, the state's evidence showed that defendant ran a stop sign; that he had a "moderate" to "strong" odor of alcohol; that his eyes were bloodshot and watery; that he swayed and had slurred speech; and that he failed several field sobriety tests. That evidence would have been sufficient to permit a correctly instructed jury to convict defendant of an "alcohol-only" DUII.

However, the jury was not correctly instructed. As evinced by the jury's questions themselves, the court's erroneous response to those questions bore directly on a matter at the core of the jury's deliberations. Consequently, a new trial is required.

Reversed and remanded for new trial.