Argued and submitted March 28, orders in *Kopp* and *Summers* affirmed; order in *Chipman* affirmed as to exclusion of results showing marijuana and methamphetamine, otherwise reversed and remanded; orders in *Totsky, Brannan, Kruchek,* and *Thomas* reversed and remanded August 29, 2001

## STATE OF OREGON,
*Appellant,*

*v.*

## GARY WAYNE CHIPMAN,
*Respondent.*

B689268; A106850 (Control)

## STATE OF OREGON,
*Appellant,*

*v.*

## WILLIAM D. KRUCHEK,
*Respondent.*

Z551739; A107013

## STATE OF OREGON,
*Appellant,*

*v.*

## COREY DAVID THOMAS,
*Respondent.*

Z502235; A107014

## STATE OF OREGON,
*Appellant,*

*v.*

## CRAIG THOMAS BRANNON,
aka Craig Thomas Brannan,
*Respondent.*

981149984; A107044

## STATE OF OREGON,
*Appellant,*

*v.*

## KRIS PETER KOPP,
*Respondent.*

Z687441; A107229

STATE OF OREGON,
*Appellant,*

*v.*

ARTHUR DANIEL SUMMERS,
*Respondent.*

Z583589; A107230

STATE OF OREGON,
*Appellant,*

*v.*

CURTIS TOTSKY,
*Respondent.*

990341576; A107508
Cases Consolidated

31 P3d 478

Rolf C. Moan, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Rebecca A. Duncan, Deputy Public Defender, argued the cause for respondents. With her on the brief was David Groom, Public Defender.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

This is a consolidation of seven criminal cases in which each defendant is charged with driving under the influence of intoxicants (DUII). ORS 813.010. The state appeals from pretrial orders excluding evidence of defendants' urine test results. The trial courts excluded the results on the ground that the tests were not performed according to the National Institute of Drug Abuse (NIDA) standards promulgated by the federal government and mandated for use in Oregon DUII cases by ORS 813.131(4) (1997).[1] We affirm as to defendants Kopp and Summers and reverse and remand the other cases to the trial courts.

Each urine sample was obtained following the issuance of a citation for DUII, and each sample was tested by the Oregon State Police laboratory. The laboratory's screening tests on each specimen showed the presence of a controlled substance, but the laboratory did not perform the specific type of confirmatory quantitative test that is required by the NIDA guidelines, which were made part of the Oregon Vehicle Code by ORS 813.131(4) (1997). In defendant Chipman's case, the results showed the presence of methadone, marijuana, nordiazepam, and methamphetamine. The record does not reveal what the results were as to the other defendants. The state planned to offer the results of the tests at each defendant's trial, but the defendants moved to suppress the results. The first hearing on the motions involved defendant Chipman, and the parties in the other cases agreed to rely on the record made in *Chipman* and to adopt the findings and conclusions of law made by the trial court in *Chipman*.

ORS 813.131(4) (1997) provided:

> "The detection levels and results of urine tests given under this section shall conform to rules and guidelines of the National Institute of Drug Abuse [NIDA] of the United States Department of Health and Human Services."

The NIDA guidelines, which are the Mandatory Guidelines for Federal Workplace Drug Testing Programs, 59 Fed Reg

---

[1] The statute has since been amended, in 1999, to remove all reference to the NIDA standards. Or Laws 1999, ch 752, § 1.

29,908 (1994), provide a general testing protocol for urine testing and "cut-off" levels for five listed classes of drugs. The listed classes of drugs are marijuana and metabolites, cocaine and metabolites, opiate and metabolites, phencyclidine, and amphetamines. 59 Fed Reg at 29,918. The guidelines require the performance of two tests. 59 Fed Reg at 29,921. In the initial test, if no drug is present from one of the five listed classes, or if a drug is present only in an amount below a specified cut-off level, a negative test result is reported. 59 Fed Reg at 29,921. If any class of drugs is screened as a positive result in the initial test, the sample is then tested again using gas chromatography/mass spectrometry testing. In the second test, the sample can be classified as positive only if the drug is present in certain quantities that are set out in the regulations. 59 Fed Reg at 29,922. The second test is commonly known as a "quantitative" test, and it is partially intended to eliminate positive results from the initial test that are due to extremely low levels of drugs and to identify which specific drug has shown up in the sample. In the present cases, no quantitative tests were performed.

■ After hearing argument as to the NIDA requirements at the pretrial hearing, the *Chipman* court ruled orally, "The results of Mr. Chipman's urine test will not be permitted to be a feature of the State's evidence." The state then asked, "Your Honor, for clarification sake, is that the entire result or only the results of the two drugs that fall under the NIDA guidelines?" The trial court percent responded by ruling that urine test results of all controlled substances were governed by the NIDA requirements. The order in *Chipman* provides, in part:

> "[Defendant's] motion challenging foundation of urine test results under ORS 813.131(4) granted. Urine test procedure violated statute, by failing to quantitate confirmatory test results. Results of [defendant's] urine test will not be admitted *as to any drugs or metabolites*." (Emphasis added.)

The state argues on appeal, as it did below, that the requirement in ORS 813.131(4) (1997) that urine testing mu:., conform to NIDA standards is a statutory requirement that · ly covers tests for certain drug classes. Specifically, it argu< that the trial court excluded test results that showed

the presence of methadone and nordiazepam, which it says the NIDA guidelines do not cover. The state further argues that, even if the statute was violated, ORS 813.131 does not require the exclusion of the results, because ORS 136.432 makes admissible evidence derived from the type of statutory violation that occurred.[2]

The defendants respond that the Oregon Legislature intended that the NIDA confirmatory testing requirement control testing for all drugs, not just testing for the NIDA-specified drug classes. They also contend that ORS 136.432 cannot save the evidence from exclusion, because ORS 813.131(4) (1997) is in the nature of a "special relevance" rule that sets a foundational requirement for the admission of drug test result evidence and that, without a showing of compliance with the NIDA standards, the evidence is not "relevant and otherwise admissible."

As we did in *State v. Jayne*, 173 Or App 533, 24 P3d 920 (2001), we examine as an initial matter the accusatory instruments in each case.[3] In *Chipman* and *Thomas*, the citations allege a violation of "ORS 813.010—Driving under the influence of a controlled sub[stance]." No specific drug is mentioned. In *Kruchek* and *Brannan*, the charging instruments contain a citation to ORS 813.010 and the mention of a specific controlled substance—marijuana. In *Totsky*, the citation contains a reference to ORS 811.100 (the basic speed

---

[2] ORS 136.432 provides:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

[3] In *Jayne*, we considered the same issue regarding the interplay between ORS 813.131 and ORS 136.432. However, we ruled that the accusatory instrument in *Jayne* was insufficient to charge the defendant with driving under the influence of controlled substances. Consequently, we held that the urine test result was not relevant in a driving under the influence of intoxicants case. *See also State v. Stiles*, 165 Or App 584, 594, 998 P2d 703 (2000). We left open the questions of whether the urine tests were required to comply with the NIDA requirements, and whether the test results would be admissible despite noncompliance.

rule), and to "DUII," but the record also contains an information charging intoxication by marijuana and alcohol. In *Kopp* and *Summers*, the citations contain only a reference to ORS 813.010 and "DUII."

■      Under ORS 813.010(2)[4] and our holding in *State v. Stiles*, 165 Or App 584, 594, 998 P2d 703 (2000), evidence of the presence of controlled substances in a body fluid is not admissible to prove a violation of ORS 813.010 unless the charging instrument alleges impairment due to controlled substances. ORS 813.010(2). In *Kopp* and *Summers*, the charging instruments do not allege impairment from a controlled substance, and therefore evidence of controlled substances is not admissible to prove their allegations. The trial courts could not have erred in those cases by excluding the evidence of the urine test results showing controlled substances, because such evidence would have been inadmissible. The rulings in those cases are affirmed.

Next, we turn to the trial courts' rulings that ORS 813.131(4) (1997) adopted NIDA's procedure as to urine analysis for all controlled substances. The NIDA standards mention only five specific classes of controlled substances by name, and they are clearly intended to provide detection level "cut-off" standards of testing for marijuana, cocaine, opiates, phencyclidine, and amphetamines, and the metabolites of those drugs. *See* 59 Fed Reg 29,908; 29,918, Sections 2.1(a), 2.4(e) and (f) (1994).[5] Those detection levels are measured by

---

[4] ORS 813.010(2) provides:

"A person may not be convicted of driving under the influence of intoxicants on the basis of being under the influence of a controlled substance unless the fact that the person was under the influence of a controlled substance is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

[5] Section 2.1(a) provides, in part:

"Hundreds of drugs are covered under Schedule I and II and while it is not feasible to test routinely for all of them, federal drug testing programs shall test for drugs as follows:

"(1) Federal agency applicant and random drug testing programs shall at a minimum test for marijuana and cocaine;

"(2) Federal agency applicant and random drug testing programs are also authorized to test for opiates, amphetamines, and phencyclidine, and

"(3) When conducting reasonable suspicion, accident, or unsafe practice testing, a federal agency may test for any drug listed in Schedule I or II of the CSA."

ratios of the drug substance to the amount of urine tested. The guidelines also provide that federal agencies who find the need to test for more drugs than those listed can submit testing protocols, including cut-off levels for those drugs, to NIDA for approval,[6] but there is nothing in *this record* about federally approved NIDA standards for any drugs other than the five classes listed above.[7]

The Oregon Legislature incorporated the NIDA guidelines into Oregon's criminal law in 1995 for use in testing urine in DUII cases where there was probable cause to believe that controlled substances were involved. Or Laws 1995, ch 676, § 1. The first question is whether the legislature intended to adopt NIDA's urine test confirmatory testing requirement for all drugs or only for tests for the types of drugs listed in the NIDA regulations. The text of ORS 813.131 answers the question by unambiguously incorporating by reference only certain parts of the NIDA guidelines. Those guidelines provide that "detection levels and results" of urine tests shall conform to "rules and guidelines" of NIDA. That language requires compliance with NIDA in two specifics—detection levels and results. Importantly, the statute does not expressly adopt NIDA's handling procedures, testing protocols, storage requirements, chain of custody provisions or other features. Thus, the Oregon Legislature has adopted only certain portions of the NIDA guidelines by specifying that only detection levels and results must conform to those guidelines.[8] All of those provisions apply only to the

Sections 2.4(e) and (f) set forth the five classes of drugs for which cut-off levels have been established.

[6] *See* Section 2.4(b), which provides:

"Any agency covered by these guidelines shall petition the Secretary in writing for approval to include in its testing protocols any drugs (or classes of drugs) not listed for federal agency testing in paragraph (a) of this section."

[7] Even as to the testing for the five listed drugs, the use of the NIDA standards is restricted to certain purposes. 59 Fed Reg 29,908; 29,917, Section 1.1(d), provides:

"These Guidelines do not apply to drug testing conducted under legal authority other than E.O. 12564, including testing of persons in the criminal justice system, such as arrestees, detainees, probationers, incarcerated persons, or parolees."

[8] Clearly, not all of the provisions covering "results" are relevant to an Oregon DUII case. For example, Section 2.4(g)(6) covers the reporting requirement of the agency official responsible for coordination of the federal drug-free workplace

listed types of drugs or to those for which the Secretary has petitioned in writing for inclusion.

There are also other indications throughout the rest of the NIDA standards that they should not be read to encompass any drugs other than those listed in the regulations or those that have been separately approved by NIDA for inclusion. For example, the following appears as previously noted, in Section 2.1(a):

> "Hundreds of drugs are covered under Schedule I and II and while it is not feasible to test routinely for all of them, federal drug testing programs shall test for drugs as follows:
>
> "(1) Federal agency applicant and random drug testing programs shall at a minimum test for marijuana and cocaine;
>
> "(2) Federal agency applicant and random drug testing programs are also authorized to test for opiates, amphetamines, and phencyclidine, and
>
> "(3) When conducting reasonable suspicion, accident, or unsafe practice testing, a federal agency may test for any drug listed in Schedule I or II of the CSA."

Section 2.4(b) contains the following:

> "Any agency covered by these guidelines shall petition the Secretary in writing for approval to include in its testing protocols any drugs (or classes of drugs) not listed for federal agency testing in paragraph (a) of this section."

Section 2.4(e)(2), which immediately follows the list of detection levels for the five listed types of drugs, provides, in part:

> "These test levels are subject to change by the Department of Health and Human Services as advances in technology or other considerations warrant identification of these substances at other concentrations. The agency requesting the authorization to include other drugs shall submit to the Secretary in writing the agency's proposed initial test method, *testing levels*, and proposed performance test program." (Emphasis added.)

---

program. Although that section therefore has to do with the reporting of "results," it would be nonsensical to conclude that the Oregon Legislature intended to adopt that part of the regulation on "results."

Section 2.4(f)(2), which immediately follows the list of detection levels for confirmatory testing of the listed five types of drugs, has similar language regarding the addition of tests for other drugs.

In conclusion, when all of the regulations are read together, it is clear that the NIDA guidelines do not provide a blanket testing procedure for all controlled substances but instead are limited to providing testing procedures for the five listed types of drugs, plus any drugs for which a specific "testing level" has been specifically approved by the federal Department of Health and Human Services. To add other controlled substances beyond those controlled by the NIDA regulation would violate the admonition of ORS 174.010 that courts are to declare the substance or terms of a statute but not insert what has been omitted. The trial courts' legal rulings that urine test results for all controlled substances are governed by ORS 813.131(4) (1997) are erroneous. In the absence of evidence of which drugs were involved, and the absence of evidence as to the NIDA detection levels for those drugs, the trial courts' exclusionary orders in *Totsky*, *Brannan*, *Kruchek*, and *Thomas* are error. The trial court's exclusionary order in *Chipman* also encompassed drugs for which no evidence existed of NIDA coverage, so the *Chipman* order is also erroneous as it pertains to test results for methadone and nordiazepam.

■ As to defendant Chipman, the trial court also excluded evidence of the presence of marijuana and methamphetamine—drugs that are covered by the NIDA guidelines. Because the State Police laboratory did not perform a confirmatory and quantitative test on Chipman's urine sample, the trial court correctly ruled that ORS 813.131(4) (1997) was violated as to those test results. The remaining issue is the legal effect of that violation under ORS 136.432. ORS 136.432 provides that a trial court may not exclude "relevant and otherwise admissible" evidence in a criminal action that was obtained in violation of a statutory provision, subject to certain exceptions. Here, the evidence is relevant to the charge of DUII. OEC 401. The next question is whether it is "otherwise admissible" evidence.

In *State v. Thompson-Seed*, 162 Or App 483, 986 P2d 732 (1999), we held that ORS 136.432 was not intended to supplant other evidentiary statutes and rules and that "ORS 136.432 simply constrains the courts from creating rules of exclusion where the legislature itself has not created them[.]" *Id.* at 489. The question then is whether the legislature has expressly or implicitly created a rule of exclusion in ORS 813.131(4) (1997)—whether the legislature intended for evidence of urine test results to be excluded in a criminal case when ORS 813.131(4) (1997) is not complied with. Both parties present plausible arguments based on the text and the context of the statute in that regard. The statute does not on its face provide for the exclusion of evidence when ORS 813.131(4) (1997) is violated, and certainly the legislature knows how to enact foundational standards when it wants to. *See, e.g.,* ORS 813.160(1) ("To be valid under ORS 813.300 * * *, the chemical analysis of a person's blood shall be performed by an individual shown to be qualified to perform such analyses[.]"). On the other hand, the adoption of the federal detection levels in the context of a DUII prosecution implies that the legislature must have had in mind the admissibility of evidence of urine test results. We turn to the legislative history underlying the statute for further assistance in discerning the legislature's intent.

ORS 813.131 (1997) was initially proposed as Senate Bill 118 (1995) by the Oregon State Police. Prior to its introduction, the only means by which the police could obtain a urine sample in a DUII case was with a search warrant or with the consent of the allegedly impaired driver. Minutes, Senate Committee on the Judiciary, SB 118, April 11, 1995, pp 7-9. The State Police offered an original draft[9] that would have allowed the taking of a urine sample without a search

---

[9] In SB 118 (1995), as originally proposed by the Oregon State Police on August 19, 1994, the provision regarding testing of urine provided:

"Chemical analyses of a person's urine shall be performed by an individual shown to be qualified to perform such analyses. The analyses shall be conducted by clinical laboratories approved by the Health Division or those accredited by the American Society of Crime Laboratory Directors Accreditation Board for determining the presence of controlled substances in urine."

That provision would originally have been added to ORS 813.160, concerning the validity of drug testing results as evidence.

warrant and would have allowed the introduction of the results of its testing into evidence upon a three-part showing. The bill established a "three-legged stool" of reliability for urine testing, based on (1) extensive training for the officers in drug impairment recognition, (2) the specific observations of impairment by those officers, and (3) a showing of the presence of controlled substances in urine testing performed by a laboratory certified by an accrediting body. Tape Recording, Senate Committee on the Judiciary, SB 118, May 31, 1995, Tape 107, Side A (statement of Chuck Hayes, Oregon State Police). A legislative concern expressed about the proposed bill almost immediately was that there is no scientific correlation between the presence of controlled substances in urine and their effect on the human body. *See, e.g.*, Minutes, Senate Committee on the Judiciary, April 11, 1995, p 8. That concern stemmed from the fact that certain drugs, especially marijuana, could test positive in a person's urine long after the effect of such drugs had worn off. Minutes, Senate Committee on the Judiciary, SB 118, April 11, 1995, Exhibit L (statement of Julia Hinckley, Criminalist).

While witnesses offered testimony that an arresting officer's observation of impairment could compensate for that shortcoming, the legislature instead sought to place quantifiable limits on the amount of drug that would constitute a positive result. The Senate rejected a standard for urine testing based on the qualifications of the testing entity, and instead adopted a bill containing a specific nanogram per milliliter cut-off level for marijuana, below which a urine test would have to be reported as negative for marijuana. A-Engrossed Senate Bill 118 (1995 session). The House proposed the current language, which tied the urine testing "detection levels" and "results" to federal standards. B-Engrossed Senate Bill 118 (1995 session). The federal standards ultimately became part of ORS 813.131(4). Or Laws 1995, ch 676, § 1.

The questions and concerns of the legislature show that its overarching concern was that urine test results must correlate closely to impairment in order to be useful and relevant in a DUII case. The legislature's ultimate adoption of the NIDA "detection levels" was intended to accomplish that

purpose.[10] Thus, while the statute does not expressly include language making urine test results inadmissible that do not comply with the NIDA guidelines, the legislature's purpose for the adoption of the guideline demonstrates that the statute imposes a preliminary admissibility requirement. Accordingly, we conclude that evidence obtained in violation of the pertinent NIDA testing protocol is not "otherwise admissible," as ORS 136.432 requires, and that the trial court's exclusion of evidence of marijuana and methamphetamine in Chipman's urine was correct.

Orders in *Kopp* and *Summers* affirmed; order in *Chipman* affirmed as to exclusion of results showing marijuana and methamphetamine, otherwise reversed and remanded; orders in percent *Totsky, Brannan, Kruchek,* and *Thomas* reversed and remanded.

---

[10] *See, e.g.,* Tape Recording, Senate Committee on the Judiciary, SB 118, April 27, 1995 (statement of Bill Taylor) (setting a standard for quantification "would show the more likely correlation between someone having marijuana in their system and being impaired").