Argued and submitted October 31, 2000, affirmed April 25, 2001

# STATE OF OREGON,
*Appellant,*

*v.*

# KATHERINE MARIE JAYNE,
*Respondent.*

## (98102376F; CA A106720)

24 P3d 920

Janet A. Klapstein, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Rebecca Duncan, Deputy Public Defender, argued the cause for respondent. With her on the brief was David E. Groom, State Public Defender.

Before Haselton, Presiding Judge, and Wollheim, Judge, and Ceniceros, Senior Judge.

HASELTON, P. J.

## HASELTON, P. J.

The state appeals from a pretrial order suppressing evidence in this criminal proceeding. ORS 138.060. The state asserts that the trial court erred in suppressing evidence obtained from a urinalysis test performed after defendant struck a pedestrian with her vehicle. For the reasons set forth below, we affirm.

Defendant was charged with the crimes of first-degree manslaughter, second-degree manslaughter, driving under the influence of intoxicants, and failure to perform the duties of a driver. ORS 163.118; ORS 163.125; ORS 813.010; and ORS 811.705. The charges resulted from an incident in which defendant struck and killed a pedestrian who was walking beside a road on the evening of Wednesday, September 2, 1998. A cat that the pedestrian had been holding was propelled through defendant's windshield and later was found dead in defendant's car. Defendant left the scene of the accident but later was driven back by a friend. She told the officer present at the scene that she had been involved in the collision. She claimed no knowledge of the dead cat in her car. The officer at the scene noted that defendant had alcohol on her breath, and also observed that defendant's eyes were red and her tongue was greenish. Defendant performed several field sobriety tests, and the officer administering the test noted a rigidity in defendant's arms. The officer asked defendant if she would consent to blood and urine testing, and she agreed. The officer took defendant to a local hospital where blood was drawn and a urine sample was obtained. Defendant was not arrested that evening.

Subsequently, a test of defendant's blood sample showed a blood-alcohol level of .10. The urine sample that is at issue in this case was forwarded to the Oregon State Police Forensic Laboratory (Lab) for testing. The lab issued a report indicating that a screening test showed that the urine sample contained methamphetamine, amphetamine, and marijuana metabolites. After the results came in, a sheriff's deputy interviewed defendant, and she acknowledged that she had used marijuana and methamphetamine on the weekend before the accident.

Defendant subsequently was charged with first- and second-degree manslaughter, driving under the influence of intoxicants, and failing to perform the duties of a driver to an injured person. Before trial, defendant moved to suppress, or alternatively moved *in limine* to exclude, the results of the urine test on the ground that the state could not meet the foundational requirements for admission of this evidence, as the Lab had not followed the testing guidelines required under the Implied Consent Laws for verification by gas chromatography/mass spectrometry of the sample.

At the hearing on defendant's motion, Ken Meneely, a forensic scientist at the Lab, testified that the Lab performed a screening test on the urine sample and detected methamphetamine and marijuana metabolites. He further indicated that there was no way to tell from the results of the urinalysis test whether or not defendant was impaired due to use of methamphetamine or marijuana at the time of the accident. He testified that marijuana metabolites could be present in urine multiple weeks after marijuana use and that methamphetamine typically could be found in urine 24 to 32 hours after use. He testified that there is no correlation between the amount of methamphetamine or marijuana metabolite detected in urine and an individual's impairment. He stated that the Lab does not follow National Institute of Drug Abuse (NIDA) guidelines that require follow-up quantification tests to be done on urine samples that test positive for drugs, because quantification of the amount present does not correlate to impairment. He stated that "[t]here is no value in the quantitative analysis." He acknowledged that, in failing to perform the quantitative analysis, the Lab was not following the implied consent statute "to the letter."[1] He further acknowledged that a "problem" with quantification was that a sample that has tested as positive in the screening could turn out negative in a quantification analysis because the amount of methamphetamine or marijuana metabolite present in the urine did not meet the NIDA quantification standards. Finally, he acknowledged that it was possible

---

[1] The statute to which the witness was referring, ORS 813.131 (1997), discussed below, was amended by the legislature in 1999 to eliminate reference to the NIDA guidelines. Or Laws 1999, ch 752, § 1. No issues are presented in this case concerning the 1999 version of the statute.

that, had the Lab performed a quantification analysis on defendant's urine, the results might have been negative.

Defendant called Dr. Grimsbo, of Intermountain Forensic Laboratories, and qualified him as an expert in the field of urinalysis testing. He testified that, under the NIDA guidelines, a screening test that is not followed by a quantification test that produces a positive result cannot be described as a positive test. He testified that all licensed clinical labs in the state that do this type of testing perform quantitative analysis as set forth in the NIDA guidelines.

The trial court granted defendant's motion to suppress the results of the urinalysis.[2] The court concluded, based on both experts' testimony, that it would be impossible to draw any conclusion from the test results about whether or not defendant was affected by the presence of drugs in her system at the time of the accident. The court concluded that the urinalysis was inadmissible under ORS 813.131(4)(1997) in conjunction with the DUII charge, and further concluded that any probative value would be outweighed by the prejudice of introducing the evidence. OEC 403. The court rejected the state's argument that, under ORS 136.432,[3] the evidence should be admitted despite the Lab's failure to comply with the statute, because the evidence was not "otherwise admissible," given the lack of a foundation for the admission of the evidence. The court further held that the evidence would not be admitted against defendant on the other charges, given the negligible value of the evidence and the chance that the jury would place undue weight on the evidence.

On appeal, the state contends that the trial court erred in suppressing the evidence of the urinalysis test. The state argues that, although the test was not performed in the manner required by ORS 813.131(4) (1997), it nonetheless

---

[2] The court also ruled that the state would not be permitted to introduce into evidence defendant's statement concerning her use of controlled substances on the weekend before the accident. The state does not assign error to that ruling.

[3] ORS 136.432 provides, in part:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution[.]"

was admissible pursuant to ORS 136.432 despite the statutory violation. The state further argues that the court erred in concluding that, under OEC 403, the evidence would be unduly prejudicial. Defendant responds that the trial court was correct in all respects.

■ We turn first to the question of whether the urinalysis evidence was relevant and admissible against defendant as to the DUII charge. ORS 813.010 provides, in part:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150;

"(b) Is under the influence of intoxicating liquor or a controlled substance; or

"(c) Is under the influence of intoxicating liquor and a controlled substance.

"(2) A person may not be convicted of driving under the influence of intoxicants on the basis of being under the influence of a controlled substance unless the fact that the person was under the influence of a controlled substance is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

In the present case, the state did not plead the DUII charge as a "controlled substance" DUII, as required in ORS 813.010(2). In *State v. Stiles*, 165 Or App 584, 594, 998 P2d 703 (2000), we held:

"[T]he phrase 'being under the influence of a controlled substance,' as used in ORS 813.010(2), necessarily encompasses all cases in which the state contends that the defendant's use of a controlled substance *materially contributed* to culpable impairment. Consequently, unless the accusatory instrument alleges the use of a controlled substance, the state is precluded from relying on a 'combined' DUII theory." (Emphasis added.)

*See also State v. McFeron*, 166 Or App 110, 116, 999 P2d 470 (2000) (evidence about the combined effect of narcotics and

alcohol was not relevant in DUII prosecution where state did not plead controlled substance DUII pursuant to ORS 813.010(2)). Under *Stiles* and *McFeron,* the urinalysis evidence at issue here was not relevant to prove the type of DUII with which defendant was charged. The trial court properly excluded the evidence as irrelevant for purposes of proving the DUII charge.

Given our conclusion that the urinalysis evidence was not relevant to the DUII charge, there is no need to address the question whether ORS 813.131 (1997) would have required suppression of the evidence.[4] That statute relates solely to evidence obtained under the Motorist Implied Consent Law to prove charges of driving under the influence of intoxicants in violation of ORS 813.010. While that statute applies to the unchallenged evidence of defendant's blood alcohol content because that evidence is relevant to the charged DUII offense, it does not apply to the urinalysis evidence because, under *Stiles* and *McFeron,* that evidence is not relevant to the type of DUII offense with which defendant was charged.

Thus, ORS 813.010(4) (1997), and the fact that the Lab did not comply with its requirements in testing defendant's urine, does not answer the question whether the urinalysis results are relevant and admissible against defendant on the charges of manslaughter and failure to perform the duties of a driver. *See generally* ORS 813.320 (limiting application of implied consent law to DUII charges); *State v.*

---

[4] ORS 813.131 (1997) provided, in part:

"(1) Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the Motorist Implied Consent Law, to a chemical test of the person's urine for the purpose of determining the presence of a controlled substance in the person's body if the person is arrested for driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance and * * *:

"* * * * *

"(b) The person is involved in an accident resulting in injury or property damage. * * *

"* * * * *

"(4) The detection levels and results of urine tests given under this section shall conform to rules and guidelines of the National Institute of Drug Abuse of the United States Department of Health and Human Services."

*Moylett*, 313 Or 540, 836 P2d 1329 (1992) (compliance with implied consent law was relevant to question of admissibility of evidence as to the DUII charge, but not as to other criminal charges). However, the question remains whether the trial court properly excluded the urinalysis evidence due to the weakness of its probative value when weighed against its potential prejudicial effect. Defendant argues that the trial court correctly excluded this evidence. We agree.

■ The admissibility of scientific evidence is a question of law. *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299, 14 P3d 596 (2000); *State v. Lyons*, 324 Or 256, 261, 924 P2d 802 (1996). Whether scientific evidence should be admitted implicates three sections of the evidence code: First, is the evidence relevant under OEC 401; second, does the evidence satisfy the criteria of OEC 702, or, in other words, has an adequate foundation been laid for the evidence; and third, is the probative value of the evidence substantially outweighed by the danger of unfair prejudice under OEC 403? *Jennings*, 331 Or at 301 (citing *State v. Brown*, 297 Or 404, 408-09, 687 P2d 751 (1984)).

The relevancy requirements of OEC 401 are not stringent. Evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" is admissible under this standard. OEC 401. Whether defendant was impaired due to the ingestion of controlled substances at the time of the accident is of consequence to the determination of whether she acted "recklessly under circumstances manifesting extreme indifference to the value of human life[.]" ORS 163.118. Although the state does not argue that the urinalysis evidence in question actually demonstrates that defendant was impaired at the time of the accident, the state argues that the evidence does show that defendant had consumed drugs at some point in the fairly recent past, and thus *could have* been impaired at the time of the accident. We agree that the evidence does meet the minimal "any tendency" requirement of OEC 401. Although the evidence did not demonstrate that defendant was impaired due to the use of drugs at the time of the accident, it did have at least some tendency to demonstrate that defendant had used methamphetamine and marijuana at some time before the accident.

The questions concerning the adequacy of the state's foundation for this evidence and the related question of whether its probative value substantially outweighs the danger of unfair prejudice are much closer. As the Supreme Court noted in *State v. O'Key*, 321 Or 285, 293, 899 P2d 663 (1995), "courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid." In assessing the admissibility of scientific evidence, the court is to consider:

"(1)  The technique's general acceptance in the field;

"(2)  The expert's qualifications and statute;

"(3)  The use which has been made of the technique;

"(4)  The potential rate of error;

"(5)  The existence of specialized literature;

"(6)  The novelty of the invention; and

"(7)  The extent to which the technique relies on the subjective interpretation of the expert." *Id.* at 299 (quoting *Brown*, 297 Or at 417).

The state acknowledges on appeal that the trial court excluded the evidence due to its "minimal probative value, due to the lack of quantification of the results," but nonetheless asserts that no question has been raised in this case as to "whether the tests met criteria for admission for scientific evidence under *State v. Brown*." Although the state is correct that defendant did not challenge the admissibility of the evidence under *Brown*—that is, defendant did not argue that, under OEC 702, the evidence is *per se* inadmissible—defendant's arguments pertaining to the relevance of the evidence and its probative value as compared to its prejudicial impact require us to consider, as did the trial court, the strength of the foundation laid for this evidence.[5]

---

[5] Defendant argued in her motion to suppress that the NIDA guidelines established the foundational requirements for admissibility of urinalysis tests, and that they required both screening and confirmation testing. While defendant's arguments focused primarily on the potential applicability of ORS 813.131(4), her arguments called into question the probative value of the evidence, given the Lab's practice of failing to perform quantification tests to confirm "positive" results from screening tests, particularly in light of the potentially prejudicial effect of the

Although *Brown* was not specifically mentioned, consideration of the strength or weakness of the foundation laid for the admission of this scientific evidence bears on our evaluation of the probative value of the evidence and is accordingly an appropriate factor to consider when weighing that probative value against prejudicial effect under OEC 403.

Defendant's evidence, presented through Grimsbo and through the NIDA guidelines, is pertinent to the first and fourth factors listed in *State v. Brown*—the technique's general acceptance in the field and the potential rate of error. Grimsbo testified that all licensed clinical labs in the state perform quantitative testing to confirm the presence of drugs when a screening test produces a positive result. That practice is consistent with the NIDA guidelines.[6] Grimsbo testified that, unless an initial urinalysis screening that shows the presence of drugs is followed by a positive confirmatory quantitative test, the result would not be considered "positive." The NIDA guidelines similarly provide that a confirmatory test is required before a sample can be described as "positive." Grimsbo indicated that the quantitative confirmatory tests can protect against false positive results, because substances such as medications and even food products can, in some circumstances, cause positive results on screening tests. Defendant's evidence tends to demonstrate that the practice of the Lab not to follow a positive screening test with a confirmatory quantitative test is *not* generally accepted in the field of urinalysis testing and also tends to demonstrate that the Lab's practice has a greater rate of error than does screening testing followed by confirmatory quantitative testing.

---

evidence on the jury. The trial court specifically ruled that the Lab's failure to perform a quantitative confirmatory test "makes the test result of negligible value and creates a substantial risk that the jury would place undue weight on evidence which is questionable even to prove the presence of marijuana or methamphetamine."

[6] The NIDA guidelines have no direct applicability to the question presented, given our conclusions concerning ORS 813.131 (1997). By their own terms, those guidelines apply only to federal agencies. However, the acceptance of those standards by the federal government provides some evidence of the general acceptance in the field of the screening and confirmatory urinalysis tests.

The state presented no evidence to counter defendant's evidence on these points. Nothing in this record suggests that performing urinalysis screening tests without confirmatory quantitative testing *is* generally accepted in this field of science or that a screening test alone is as accurate (or more accurate) than a screening test followed by a confirmatory test. Although defendant did not argue, and the trial court did not find, that the state's proffered evidence was so lacking in foundation that it was inadmissible *per se* under OEC 702, the court properly considered the weakness of the foundation laid in assessing the probative value of the evidence and reaching its conclusion to exclude the evidence under OEC 403.

In *State v. O'Key*, 321 Or at 298-99, the court stated:

"Once the testimony is determined to be relevant under OEC 401, helpful under OEC 702, and not barred by OEC 402, it will be excluded only if its probative value is substantially outweighed by one or more of the countervailing factors set forth in OEC 403, which provides:

" 'Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.'

"In evaluating the incremental probative value of the proffered evidence, the court must assume that the evidence will be believed by the trier of fact. When the incremental probative value of the proffered scientific evidence is relatively slight, and when the jury is likely to overvalue or be misled into giving the evidence undue weight, the likelihood of exclusion under OEC 403 is enhanced."

The court in *O'Key* further cited approvingly the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993), for the proposition that "because of the risk that expert testimony can be both powerful and quite misleading because of the difficulty in evaluating it, the trial court should exercise *more* control over expert witnesses than over lay witnesses in counterbalancing possible prejudice with probative force." *O'Key*, 321 Or at 305 (emphasis added).

According to the state's own expert witness, the urinalysis evidence at issue here could not demonstrate that defendant was impaired by drugs at the time of the accident. At most, if the "positive" result is assumed to be correct despite the lack of a confirmatory quantification test, the evidence could demonstrate that defendant had used drugs some time before the accident. In *State v. Sampson*, 167 Or App 489, 511, 6 P3d 543, *rev den* 331 Or 361 (2000), we considered a similar question as to whether "drug recognition expert" protocols, which qualified as scientific evidence under OEC 702, nonetheless should be excluded under OEC 403. We concluded that the evidence should not be excluded because the proponent of the evidence had "adequately demonstrated, through the studies it introduced into evidence, *a reasonably high correlation between the results* of the DRE protocol *and impairment of the subject.*" *Id.* (emphasis added). Here, by comparison, all of the experts agreed that the urinalysis evidence simply cannot properly be viewed as having a direct correlation to the impairment of the subject at the time of the accident.[7]

Clearly, whether defendant was impaired due to alcohol or drug consumption *at the time of the accident* was material to the state's case. However, the trial court correctly accorded the urinalysis evidence little probative value as to that question, because of the conceded lack of direct correlation between the urinalysis test results and impairment at the time of the accident. At most, the evidence could properly be used to demonstrate that defendant had consumed drugs at some point before the accident.[8] It also could be viewed as

---

[7] No DRE protocol was followed in this case. Although an officer did make some observations of defendant near the time of the accident and administered some field sobriety tests, he did not conduct a DRE evaluation of defendant (which, as noted in *Sampson*, could include urinalysis testing). The officer's observations of defendant were inconclusive, although he did observe some signs that were consistent with intoxication. Needless to say, the evidentiary value of a urinalysis test performed as part of a complete DRE evaluation might be viewed very differently by a court performing an OEC 403 balancing.

[8] The state argues that the evidence of methamphetamine in defendant's urine also could have been used to impeach defendant's statement that she had used drugs the previous weekend, some 72 hours before the accident. However, as noted above, *see* 173 Or App at 537 n 2, the trial court suppressed defendant's statement, and the state has not assigned error to the court's suppression of that statement. We therefore do not consider the state's argument that the urinalysis evidence could have been used in this manner.

providing some slight corroboration of the officer's observation of symptoms, *e.g.*, red eyes and greenish tongue, that the officer associated with drug use. However, given the significant weight that a jury is likely to accord this type of evidence, the potential for prejudice here is high. Specifically, the jury might infer, from the very fact that it is being told that defendant tested "positive" for marijuana and methamphetamine after the accident, that there necessarily must be some correlation between the drugs in her urine and her physical or mental condition at the time of the accident. Alternatively, the jury might assume that because defendant had consumed drugs in the past, she was a reckless person and was likely to have been acting in a reckless manner at the time of the accident. Evidence that may cause "unfair prejudice," for purposes of OEC 403, is evidence that has "an undue tendency to suggest a decision on an improper basis," and "describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish the fact of consequence." *O'Key*, 321 Or at 321. In this case, the trial court correctly concluded that the probative value of this evidence was low and the danger of unfair prejudice was high. The trial court did not err in excluding the urinalysis evidence.

Affirmed.