## STATE OF OREGON,
*Respondent,*

*v.*

## BRYON SCOTT MOODY,
aka Brian Moody,
*Appellant.*

00FE0012; A116566

116 P3d 935

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Jill Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Edmonds, Judge,* and Deits, Judge pro tempore.

WOLLHEIM, P. J.

---

\* Edmonds, J., *vice* Leeson, J. pro tempore.

## WOLLHEIM, P. J.

Defendant appeals from judgments of conviction for assault in the third degree, ORS 163.165, driving under the influence of intoxicants (DUII), ORS 813.010, recklessly endangering another person, ORS 163.195, and reckless driving, ORS 811.140. Defendant raises three assignments of error: (1) the trial court erred in denying his motion for a judgment of acquittal; (2) the trial court erred in denying his motion *in limine* to exclude evidence of his urinalysis; and (3) the trial court erred in imposing a departure sentence. We vacate defendant's sentences and remand for resentencing, but otherwise affirm.

Defendant was involved in a two-car motor vehicle accident that seriously injured the victim. Before trial, defendant filed a motion *in limine* to exclude the results of his urinalysis, arguing that there was no correlation between the presence of controlled substances in his urine and his level of impairment at the time of the accident. At best, defendant argued, the urinalysis showed that he had used methamphetamine and marijuana at some time before the accident. Therefore, according to defendant, because of the minimal probative value and high potential for prejudice, the urinalysis evidence should be excluded pursuant to OEC 403. The state argued that the legislature, by enacting ORS 813.131, had deemed urinalysis evidence to be admissible and that the results were relevant to defendant's "state of mind and his actions and his physical condition at the time he was driving, and they are admissible." The trial court agreed with the state and denied defendant's motion.

Before a bench trial, defendant renewed his motion *in limine* based on *State v. Jayne*, 173 Or App 533, 24 P3d 920 (2001). According to defendant, *Jayne* precluded the admission of urinalysis evidence under OEC 403 because that evidence could not be used to establish the defendant's level of impairment at the time of driving. The trial court distinguished *Jayne* on the facts, determining that the urine sample in *Jayne* had not been subjected to a quantitative analysis, *id.* at 544, and defendant's urine sample here had been quantitatively analyzed. However, the trial court reserved ruling on the motion for reconsideration until after the state

had presented its entire case. The motion was ultimately denied.

Defendant also filed a motion for a judgment of acquittal after the conclusion of the state's case. The trial court denied defendant's motion in regard to the DUII count, because "there's enough evidence that a reasonable trier of fact could find that [defendant] was under the influence of a controlled substance," and also denied it in regard to the counts of recklessly endangering another person and reckless driving. The trial court did, however, grant defendant's motion as to the count of assault in the second degree, instead allowing the state to proceed on the lesser-included offense of assault in the third degree.

Defendant was ultimately convicted of assault in the third degree, DUII, recklessly endangering another person, and reckless driving. Defendant appeals from those judgments of conviction.

■ ■ We begin with defendant's second assignment of error, the denial of his motion *in limine* to exclude the results of his urinalysis under OEC 403. Defendant relies, as he did before the trial court, on our decision in *Jayne*. The state responds that *Jayne* is distinguishable, that OEC 403 does not apply because this was a bench trial, and that, in any event, the record shows that the trial court recognized the limited value of the urinalysis evidence in its decision. We review the admissibility of the urinalysis evidence for errors of law, *Jayne*, 173 Or App at 540, and conclude that the trial court did not err in admitting the evidence.

In *Jayne*, we affirmed a trial court order granting the defendant's motion *in limine* to exclude the results of her urinalysis. The defendant was charged with first- and second-degree manslaughter, DUII, and failure to perform the duties of a driver. 173 Or App at 535. A qualitative urinalysis was performed, but no quantitative testing was done. *Id.* at 536. Meneely, a forensic scientist from the testing lab, testified that, although the National Institute of Drug Abuse (NIDA) guidelines and ORS 813.131 (1997)[1] require quantitative testing to be done, no such testing was performed

---

[1] ORS 813.131 (1997), the version of the implied-consent statute at issue in *Jayne*, required that all urinalyses conform to the NIDA guidelines. The statute was amended in 1999, and no longer refers to the NIDA guidelines. Or Laws 1999,

because quantitative test results still could not correlate to the defendant's level of impairment. Meneely also testified that, had a quantitative test been performed, the results may have come back negative because the amount of methamphetamine or marijuana metabolite present in the defendant's urine did not meet the NIDA quantification standards. *Id.* Dr. Grimsbo, the defendant's expert witness, testified that all labs follow NIDA standards and that a urinalysis performed without quantification could not "be described as a positive test." *Id.* at 537.

As to the DUII count, we held that the urinalysis evidence was not relevant and therefore was properly excluded because the defendant was not charged with a controlled substances DUII pursuant to ORS 813.010(2).[2] *Id.* at 539. Therefore, we did not address the relevance of urinalysis evidence, quantified or not, with respect to a charge of a controlled substances DUII. We next addressed the admissibility of the urinalysis as scientific evidence with respect to the charges of manslaughter and failure to perform the duties of a driver. We first determined the evidence to be relevant under OEC 401. *Id.* at 540. We then determined, in light of the testimony presented, that the evidence was "*not* generally accepted in the field of urinalysis testing and also tends to demonstrate that the Lab's practice has a greater rate of error than does screening testing followed by confirmatory quantitative testing[,]" and that the weakness of the foundation laid directly affected the probative value of the evidence. *Id.* at 542-43[3]

---

ch 752, § 1. The current version at issue in this case requires only that a urinalysis "be performed in an accredited or licensed toxicology laboratory." ORS 813.131(4).

[2] ORS 813.010(2) provides:

"A person may not be convicted of driving under the influence of intoxicants on the basis of being under the influence of a controlled substance or an inhalant unless the fact that the person was under the influence of a controlled substance or an inhalant is pleaded in the accusatory instrument and is either proved at trial or is admitted by the person through a guilty plea."

[3] In analyzing the admissibility of the urinalysis as scientific evidence, we considered the seven factors set forth in *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984):

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

(emphasis in original). After considering the potential prejudice of the evidence due to its inability to correlate to the defendant's impairment at the time of the accident and "the significant weight that a jury is likely to accord this type of evidence," we concluded that the trial court did not err in excluding the evidence. *Id.* at 544-45.

Although defendant's reliance on *Jayne* is understandable, here, we have a different situation. First, unlike in *Jayne*, the urinalysis evidence at issue here was quantitatively analyzed. Kent Johnson, a forensic toxicologist from the testing lab, testified that the quantitative analysis was performed by gas chromatograph mass spectrometry, which "under the federal regulations is the gold standard, the only recognized confirmation technique for confirming the presence [of controlled substances]." Thus, in this case, there was an adequate foundation for the urinalysis evidence.

Second, in *Jayne*, we did not have occasion to address the admissibility of urinalysis evidence with respect to the charge of a controlled substance DUII. Here, the state properly charged defendant with a controlled substance DUII pursuant to ORS 813.010(2). Accordingly, we must determine the admissibility of the urinalysis evidence with respect to the charge of a controlled substance DUII.

■■ ORS 813.010(1) defines the crime of DUII and provides, in part:

> "A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:
>
> "* * * * *
>
> "(b) Is under the influence of intoxicating liquor, a controlled substance or an inhalant[.]"

"Under ORS 813.010(1)(b), a person is under the influence of intoxicating liquor or a controlled substance when the person's physical or mental facilities are adversely affected to a

---

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

noticeable or perceptible degree." *State v. Stroup*, 147 Or App 118, 122, 935 P2d 438 (1997). Thus, to convict a defendant of a controlled substance DUII, the state must not only prove impairment, but must also prove that the impairment was due to a controlled substance. *See* ORS 813.010(2) (requiring fact that the person was under the influence of a controlled substance to be proved at trial in order to convict the person of a controlled substance DUII).

■ A urinalysis result showing the presence of a controlled substance in a defendant's body is direct evidence from which a trier of fact can infer, along with other evidence of impairment, that a defendant's impairment was due to the influence of a controlled substance. *See* OEC 401. If the state had evidence of impairment, but no evidence that the impairment was due to the influence of a controlled substance, it could not prove every element of the offense. Conversely, if the state had only a urinalysis result showing the presence of a controlled substance but no evidence of impairment, it would also not be able to prove every element of the offense. Thus, in a prosecution involving a controlled substance DUII, a urinalysis result showing the presence of a controlled substance is relevant because it is probative of an element of the offense, even though it does not, by itself, prove impairment. *See State v. Garrett*, 187 Or App 201, 205, 66 P3d 554 (2003) (holding that the prejudicial value of prior conviction evidence was outweighed by its probative value because a prior conviction was an element of the offense).

ORS 813.131, the implied consent statute, recognizes the probative value of a urinalysis as we have explained. That statute provides, in part:

> "(1) Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the Motorist Implied Consent Law, to a chemical test of the person's urine *for the purpose of determining the presence of a controlled substance or an inhalant in the person's body* if the person is arrested for driving while under the influence of intoxicants * * *."

(Emphasis added.) The language of that statute does not posit a necessary causative relationship between a urinalysis

showing the presence of a controlled substance and impairment. Nevertheless, it demonstrates that the legislature recognized that a urinalysis is relevant to proving an element of the offense of a controlled substance DUII. In short, we conclude that urinalysis evidence is relevant to an essential element of the offense of a controlled substance DUII.

Third, the potential for prejudice in this case is not as substantial as it was in *Jayne*. The trial court in *Jayne* excluded the urinalysis evidence *pretrial*, because of the *potential* prejudicial influence the evidence may have exerted on the jury. Here, we have a different situation procedurally. Defendant waived his right to a jury trial and opted for a bench trial. Furthermore, although defendant's initial motion *in limine* was denied pretrial, defendant's renewed motion was not decided until *after* the state had presented its entire case. Thus, the trial court had the benefit of considering the admissibility of the urinalysis evidence along with all the other essentially unrebutted evidence that the state presented against defendant,[4] and the trial court made specific factual findings as to how it considered the evidence. *See State v. Cafarelli*, 254 Or 73, 76, 456 P2d 999 (1969) ("In a trial to the court we can assume that any questionable evidence would be disregarded."); *but see State v. Marrington*, 335 Or 555, 565, 73 P3d 911 (2003) (questioning the stated proposition from *Cafarelli*). Accordingly, we recount the testimony presented to the trial court before it ruled on defendant's motion *in limine*.

David Zalundaro followed defendant's car for some ten miles before the accident occurred. Zalundaro testified that he noticed defendant "gradually crossing the center line back into the, you know, our, the right-hand lane and then back across the center line." Zalundaro considered calling 9-1-1 at that point, but decided against it after defendant ceased swerving and began driving normally. However, two to three miles later, Zalundaro again observed defendant swerving, this time going "fully into the oncoming lane." At

---

[4] Defendant called only two witnesses in his defense. The first witness, Dr. Raymond Grimsbo, testified to the same effect as the state's expert witness, Johnson. Defendant's second witness, Robert Doyle, was defendant's former attorney who testified as to matters unrelated to the issue of defendant's guilt.

that point, Zalundaro called 9-1-1 to report defendant's erratic driving.

After Zalundaro called 9-1-1, defendant again swerved into the oncoming lane, narrowly missing an oncoming car driven by Star Kelley, and forcing Kelley to pull out to the emergency lane to avoid hitting defendant. After the near-miss, defendant pulled back into his lane, but then veered sharply "right back into the oncoming lane and hit the [victim's] car." Zalundaro also testified that traffic was light, and that there were no adverse driving conditions that day. The accident occurred around 9:30 a.m.

Both cars were damaged in such a way that defendant and the victim had to be carefully extracted from their respective cars. Kelley was the first person at the scene to attend to defendant. She testified that defendant was "bleeding a lot and complaining about pain in his left leg." She described defendant as "incoherent," and assumed he had suffered a head injury. After about 15 minutes, an ambulance arrived, and after defendant was extracted from his car, the ambulance transported him to the trauma center. A marijuana pipe that smelled of burnt marijuana was found in defendant's car.

At the hospital, after defendant had been treated for his injuries, a urine sample was obtained by the hospital and a qualitative drug screening was performed that indicated the presence of methamphetamine and marijuana. In addition, a blood sample was taken that tested negative for alcohol. The responding officer, Reeher, obtained a second urine sample from defendant that indicated the same result, and had that sample reconfirmed by Legacy Metrolab through a quantitative analysis.

Defendant admitted to both hospital personnel and Reeher that he had smoked marijuana the day before, but denied using methamphetamine. Reeher and the attending doctor, Scherer, both testified that defendant did not exhibit any physical signs of being under the influence of an intoxicant. Defendant was coherent, he spoke and responded normally, and his eyes did not indicate any impairment. However, Scherer testified that morphine was administered to defendant, which, as does marijuana, counteracts the effects

of methamphetamine. In addition, Reeher testified that he formed the opinion that defendant was under the influence of controlled substances at the time of the accident based on defendant's erratic driving, the marijuana pipe found in defendant's vehicle, and defendant's admission that he had smoked marijuana the day before. A full neurological examination was also performed on defendant, which showed no serious injuries to defendant's head. When presented with this information, Kelley testified that had she known that, she "would question why he was so incoherent if he did not have the head injury."

The state's expert witness, Johnson, testified regarding defendant's urine test results. Despite having conducted a quantitative analysis, Johnson testified that you "cannot judge or cannot tell impairment from a drug test[,] * * * [only] that the drug was used at some point in time."

Defendant's Post-Prison Supervision officer, Anders, testified that he had met with defendant the evening before the accident and suspected that defendant had been using methamphetamine. Anders asked defendant to produce a urine sample, which defendant was unable to do. Defendant was supposed to meet again with Anders the morning of the accident to provide a urine sample.

After finding defendant guilty of the other charges, but before rendering a verdict on the DUII charge, the court made explicit findings showing how it considered the urinalysis evidence in relation to all the other evidence presented:

> "We know that the day before that, [defendant] used marijuana, and we know within the last two or three days that he used methamphetamine. Now, at least the day before, the probation officer, Jess Anders, believed that [defendant] had been using methamphetamine and wanted him to take a [urinalysis] and he couldn't produce a urine sample.

> "And we know that the subsequent samples of his urine indicate that he had a positive for methamphetamine and he had a positive for marijuana, and we have the, I guess I would call it the unexplained behavior of, of the continual drifting into the opposite lane, sometimes to the total width

of the vehicle, and did, the behavior that occurred immediately going into the accident where Miss Kelley was forced off the road, goes back to the lane, comes back into the lane, and hits [the victim's] vehicle within her lane left front to left front.

"* * * * *

"Whether he was falling asleep, whether he was going into a crash, that is, actually going to sleep because of lack of sleep deprivation at 9:00 in the morning is real tough. A driving under the influence of intoxicants as we've talked about this before, the issue is whether the *controlled substances that he had in his system affected his, affected his mental or physical fact, faculties to a perceptible degree.*

"And *so the issue is not the percentage of methamphetamine or marijuana that was in [defendant's] system, but what effect did it have on him.* Is there any reasonable inferences that could be drawn by the Court in determining whether [defendant] was under the influence of intoxicants?

"But I have a complete neurological on [defendant] that followed this accident. And the thing that [defendant] had going for him is the neurological and the physical observations of probably everybody but Miss Kelley that have testified in this case actually have him reasonably alert and reasonably responsive and his eyes responsive. From the same token, he wasn't responsive at the time of the accident. This accident could not have occurred if he was responsive. It would not have occurred if he was responsive.

"And it's the Court's inference that he did have drugs on board and it's the Court's inference that he was in the point of minimal comprehension or alertness at the time that this accident occurred or it would not have occurred."

(Emphasis added.) After careful review of the record, we conclude the urinalysis evidence was not overly prejudicial. The court properly limited its consideration of the urinalysis evidence to establish only that defendant's impairment was due to the influence of a controlled substance. If no other evidence existed from which the trial court could have inferred impairment, then the potential prejudice of the urinalysis evidence would be heavier. However, there was ample evidence from which the trial court could infer impairment, as reflected in

its findings. Therefore, given the substantial probative value and the slight potential for prejudice of the urinalysis evidence, the trial court did not err in admitting the urinalysis evidence with respect to the DUII charge.[5]

We next turn to defendant's first assignment of error. Defendant argues that the trial court erred in denying his motion for a judgment of acquittal because the state failed to prove that he was under the influence of intoxicants. We reject defendant's argument without further discussion because, as discussed previously, there was enough evidence from which a rational trier of fact could have found defendant guilty of DUII beyond a reasonable doubt. *See State v. Metcalfe*, 172 Or App 501, 503, 19 P3d 374 (2001) (stating standard of review).

■  Finally, we address defendant's third assignment of error. Defendant argues that the trial court erred in departing upward on defendant's sentence in violation of *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), because the trial court based the departures on facts that were not pleaded and not proved to a jury beyond a reasonable doubt. Defendant concedes that the issue is unpreserved, but argues that we should address his claim as plain error. The state counters that defendant's arguments do not meet the requirements of plain error. We agree with defendant.

The trial court departed on the basis of defendant's "persistent involvement in similar criminal activity" and because defendant was "under supervision" at the time. In *State v. Perez*, 196 Or App 364, 373, 102 P3d 705 (2004), *rev allowed*, 338 Or 488 (2005), we held that a trial court's use of those same departure factors in violation of *Apprendi* and *Blakely* constitutes plain error that requires the exercise of our discretion. In addition, we held in *State v. Williams*, 197 Or App 21, 25, 104 P3d 1151 (2005), that waiver of the right to a jury trial during the guilt phase does not equate to a

---

[5] We do not consider the admissibility of the urinalysis evidence with respect to the other offenses defendant was charged with, because the trial court did not consider the evidence in finding defendant guilty of those charges. In the trial court's detailed findings of fact, it did not once mention the urinalysis evidence.

waiver of the right to have a jury determine facts at the sentencing phase. Therefore, we vacate defendant's sentences and remand for resentencing.

Sentences vacated; remanded for resentencing; otherwise affirmed.