Argued and submitted December 19, 2008, affirmed March 19, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

EDDIE QY FONG,
true name Eddie Quincy Fong,
*Defendant-Appellant.*

Washington County Circuit Court
D043657T; A130371

204 P3d 146

Brandon G. Williams, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Michael Kakuk, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Carson, Senior Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant appeals a judgment of conviction for driving under the influence of intoxicants (DUII). Relying on *State v. Jayne*, 173 Or App 533, 24 P3d 920 (2001), defendant asserts that the trial court erred in admitting the results of a urine test indicating the presence of Valium and marijuana metabolites in his urine when the results of the test were not confirmed with a quantitative test. Because we conclude that a quantitative test is not required for the evidence at issue to be admissible in a DUII case, we affirm.

On August 27, 2004, after observing defendant's vehicle cross over the center line of the road, Groshang, a City of Beaverton Police Officer, pulled the vehicle over. Groshang found defendant behind the wheel of the vehicle and observed that he was slow and lethargic. In response to Groshang's inquiry as to whether he had taken any medications, defendant informed the officer that he had taken Ativan and Valium, medications for which he had prescriptions. Groshang then contacted Debolt, a City of Beaverton Police Officer who is certified as a drug recognition expert and instructor.

When Debolt arrived at the scene, he asked defendant about the medications defendant was taking based on the information Debolt received from Groshang. Defendant responded that he had taken Ativan. Debolt observed that defendant's eyes were bloodshot and watery, his eyelids were relaxed and droopy, his face was pale, and his speech was slurred and difficult to understand. Believing defendant to be intoxicated, Debolt then asked defendant to perform some field sobriety tests. Defendant agreed to allow Debolt to look in his eyes and conduct a horizontal gaze nystagmus test. The results of that test indicated that defendant was impaired. Accordingly, Debolt placed defendant under arrest for DUII.

Following the arrest, Debolt took defendant to the police station and administered a breath test that registered a blood alcohol level of 0.00 percent. The officer also completed the full battery of drug recognition evaluation (DRE)

tests, including collecting a urine sample from defendant.[1] Debolt concluded that defendant was "under the influence of [a] central nervous system depressant" and was unable to drive.

The urine sample was sent to Oregon State Police Crime Laboratory, which is certified by the American Society of Crime Laboratory Directors, to be tested for the presence of controlled substances. The tests showed that Valium, a Valium metabolite, and a marijuana metabolite were present in defendant's urine. Although the presence of those substances was confirmed, the lab did not test to determine the quantity of the drugs in the urine. The forensic scientist who

---

[1] As explained in *State v. Sampson*, the 12 DRE protocol steps are as follows:

"1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

"2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

"3. The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

"4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

"5. The DRE officer conducts four FSTs: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test.

"6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

"7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

"8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

"9. The DRE officer inspects for injections sites.

"10. The DRE officer conducts a focused interrogation and observation of the subject's behavior.

"11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug the subject took.

"12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer."

167 Or App 489, 494-95, 6 P3d 543, *rev den*, 331 Or 361 (2000) (footnotes omitted; citing National Highway Traffic Safety Administration, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993)).

testified at trial stated it was not the practice of the laboratory to test for the quantity of drugs in urine.

Defendant filed a pretrial motion to exclude the results of the urine test based on *Jayne*, OEC 401, and OEC 403. Defendant further moved to exclude the DRE evidence "unless all twelve steps [were] first shown to have been performed." At argument on his motion, defendant asserted that the test results should be excluded due to the laboratory's failure to perform a quantitative test. The court concluded that a quantitative analysis was not required for the test results to be admissible. As to the admission of the DRE evidence, defendant indicated to the court that he intended to object if one of the DRE steps was not performed, and the trial court deferred its ruling. When the urinalysis results were offered at trial, defendant objected to their admission. However, during the trial he made no objection to the other DRE evidence. Ultimately, the jury convicted defendant of DUII.

Defendant contends that the urinalysis evidence was inadmissible as scientific evidence as a matter of law as a result of this court's holding in *Jayne* because "the urine was tested only for the presence of drugs and was not tested for the quantity of drugs." (Emphasis omitted.) Defendant posits that because "this is a DUII case, the implied consent statute, ORS 813.131, establishes the foundational requirements for the admission of evidence, not the more general evidence statute[.]"[2]

---

[2] ORS 813.131 provides, in full:

"(1) Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the Motorist Implied Consent Law, to a chemical test of the person's urine for the purpose of determining the presence of a controlled substance or an inhalant in the person's body if the person is arrested for driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance and either:

"(a) The person takes a breath test described in ORS 813.100 and the test discloses a blood alcohol content of less than 0.08 percent; or

"(b) The person is involved in an accident resulting in injury or property damage. A urine test may be requested under this paragraph regardless of whether a breath test has been requested and regardless of the results of a breath test, if one is taken.

"(2) A police officer may not request a urine test unless the officer is certified by the Board on Public Safety Standards and Training as having

In *Jayne*, this court affirmed a trial court order excluding results of urine testing pursuant to OEC 403. In that case, the defendant was charged with manslaughter, DUII, and failure to perform the duties of a driver following an incident in which she struck and killed a pedestrian. The defendant in that case was not charged with a controlled-substance-related DUII. 173 Or App at 538-39. Accordingly, we determined that urinalysis evidence was not relevant to the DUII charge and considered whether the evidence should be admissible with respect to charges of manslaughter and failure to perform the duties of a driver. *Id.* at 539. We concluded that the failure of the laboratory in that case to perform "confirmatory quantitative testing" indicated the evidence had a weak foundation as scientific evidence that, in turn, negatively affected the probative value of the evidence. *Id.* at 542-44. We noted that the urinalysis evidence had limited probative value "because of the conceded lack of direct correlation between the urinalysis test results and impairment at the time of the accident." *Id.* at 544. We also ruled that the danger of unfair prejudice was high because the jury could infer that the defendant "was a reckless person and was likely to have been acting in a reckless manner at the time of the accident" or that there was necessarily a "correlation between the drugs in her urine and her physical or mental condition at the time of the accident." Our holding in *Jayne* did not, as defendant asserts, make urinalysis evidence inadmissible in every case where quantitative test results are not obtained. *Id.* at 543 (noting that in that case the "defendant did not argue, and the trial court did not find, that the [urinalysis] evidence was so lacking in foundation that it was inadmissible *per se* under OEC 702").

■ ■ Further, this case is clearly distinguishable from *Jayne*, and its result is not controlling here. Unlike *Jayne*, defendant in this case was charged with a controlled

completed at least eight hours of training in recognition of drug impaired driving and the officer has reasonable suspicion that the person arrested has been driving while under the influence of a controlled substance, an inhalant or any combination of an inhalant, a controlled substance and intoxicating liquor.

"(3) A person asked to give a urine sample shall be given privacy and may not be observed by a police officer when producing the sample.

"(4) A chemical analysis of a person's urine under this section shall be performed by an accredited or licensed toxicology laboratory."

substance DUII. That charge makes urine test results demonstrating the presence of controlled substances in his urine highly probative. As this court explained in *State v. Moody*, 201 Or App 58, 64, 116 P3d 935, *rev den*, 339 Or 609 (2005), *modified on recons*, 207 Or App 304, 140 P3d 1171, *rev den*, 342 Or 46 (2006), "to convict a defendant of a controlled substance DUII, the state must not only prove impairment, but must also prove that the impairment was due to a controlled substance." In light of that requirement, urine test results "showing the presence of a controlled substance in a defendant's body is direct evidence from which a trier of fact can infer, along with other evidence of impairment, that a defendant's impairment was due to the influence of a controlled substance." *Id*. As we also observed in *Moody*, ORS 813.131(1), which deems motorists to have impliedly consented to urine testing "for the purpose of determining the presence of a controlled substance or inhalant in the person's body if the person is arrested for driving while under the influence of intoxicants[,]" demonstrates the legislature's recognition "that urinalysis evidence is relevant to proving an essential element of the offense of a controlled substance DUII." *Moody*, 201 Or App at 65.

Defendant in this case was charged with a controlled substance DUII. For that reason, unlike *Jayne*, this case falls squarely within the purview of ORS 813.131, which was amended in 1999.[3] As a result of that amendment, ORS 813.131(4) provides that "[a] chemical analysis of a person's urine under this section shall be performed in an accredited or licensed toxicology laboratory." Prior to the amendment, that section required that

> "[t]he detection levels and results of urine tests given under this section shall conform to rules and guidelines of the National Institute of Drug Abuse [NIDA] of the United States Department of Health and Human Services."

ORS 813.131(4) (1997). The NIDA guidelines required, among other things, that urinalysis test results be confirmed with a quantitative test. *See State v. Chipman*, 176 Or App

---

[3] To the extent ORS 813.131 was discussed in *Jayne*, it was the 1997 version of that statute rather than the amended version that was relevant. 173 Or App at 536 n 1.

284, 287-88, 31 P3d 478 (2001) (describing the NIDA testing protocol). The amended statute, in contrast, no longer requires compliance with the NIDA guidelines and, therefore, does not require quantitative testing. The legislature's elimination of the requirement that quantitative testing be conducted implies that the legislature intended that such quantitative tests not be performed as part of urinalysis testing under ORS 813.131. *See State v. Webb*, 324 Or 380, 390, 927 P2d 79 (1996) ("enacted legislative changes are part of a statute's context").

■ Nonetheless, defendant argues that urinalysis test results remain inadmissible as scientific evidence in the absence of quantitative testing. Because the text and context of ORS 813.131 do not expressly dispense with the need for quantitative testing, the statute could plausibly be read to support either the state's or defendant's position. We therefore turn to the legislative history underlying the statutory amendment.[4]

The amendments initially proposed by the Oregon State Police would have changed ORS 813.131(4) to read as follows: "The initial cutoff levels used for the screening tests of urine specimens given under this section shall conform to the rules and guidelines of the Substance Abuse and Mental Health Services Administration of the United States Department of Human Services * * *." Senate Bill (SB) 242 (1999) (as introduced). The changes were, in part, intended to clarify that quantification of the amount of drugs in urine was not required as part of a confirmatory test. Tape Recording, Senate Committee on the Judiciary, SB 242, Feb 17, 1999, Tape 41, Side B (statement of Julia Hinkley, Oregon State Police Crime Laboratory). That was because "[q]uantitation of the drugs identified in urine gives no useful information as to the level of impairment of a particular individual." Testimony, Senate Committee on the Judiciary, SB 242, Feb 17, 1999, Ex T (statement of Julia Hinkley). Further, there was concern that quantitative urine tests would "lead to increased analysis turn around time and increased costs." *Id.*

---

[4] We note that ORS 174.020(3) provides that "[a] court shall give the weight to the legislative history that the court considers appropriate."

Chuck Hayes of the Oregon State Police also appeared in support of the proposed changes. Minutes, Senate Committee on the Judiciary, SB 242, Feb 17, 1999.

Raymond Grimsbo from Intermountain Forensic Laboratories appeared in opposition to the bill. He expressed his concern that, as written, the bill would eliminate the requirement that confirmatory testing be performed on urine samples submitted, and that it was important that a confirmatory test be completed. Tape Recording, Senate Committee on the Judiciary, SB 242, Feb 17, 1999, Tape 41, Side B (statement of Raymond Grimsbo, forensic scientist). Hinkley responded that confirmatory tests would continue to be performed, but that the concern was that when a quantitative result from urine tests is reported, there is a misleading appearance created that the number reported has some meaning in terms of the level of impairment. Further, when the information is introduced into a court proceeding, it may be misrepresented as meaning something that it does not.[5] Tape Recording, Senate Committee on the Judiciary, SB 242, Feb 17, 1999, Tape 41, Side B (statement of Julia Hinkley).

Following the public hearing, the bill was amended to remove all reference to the federal standards and require only that the urine tests be performed in an accredited or licensed laboratory. According to the legislative history, that change was to ensure that the analysis was performed in a scientifically acceptable fashion. Tape Recording, Senate Committee on the Judiciary, SB 242, Apr 14, 1999, Tape 121, Side B (statement of Charles Hayes, Oregon State Police). However, the intent remained to eliminate any requirement that quantitative tests be required for urine samples obtained pursuant to the implied consent statute. *See* Tape Recording, Senate Committee on the Judiciary, SB 242, Apr 14, 1999, Tape 121, Side B (statement of Julia Hinkley) (discussing quantification of test results); Tape Recording, Senate Committee on the Judiciary, SB 242, Apr 14, 1999, Tape 121, Side B (statement of Ingrid Swenson, Oregon

---

[5] Hinkley also explained that the NIDA standards were not intended for use in the criminal justice system. Instead, they were intended to govern workplace drug testing of federal employees and were designed to detect abuse levels of drugs. Tape Recording, Senate Committee on the Judiciary, SB 242, Feb 17, 1999, Tape 41, Side B (statement of Julia Hinkley).

Criminal Defense Lawyers Association) (opposing bill, noting that no quantitative testing would be performed); *see also* Staff Measure Summary, Joint Committee of Ways and Means, SB 242, June 1 and 4, 1999 (fiscal impact if bill not passed; high levels of testing result in significant additional costs). Both the Senate and the House ultimately adopted SB 242 in its amended form.

Thus, although the statute does not expressly say so, it is clear from the legislative history that the legislature intended that a quantitative analysis is *not* required as a condition of admissibility. Accordingly, the legislature has recognized the importance of urinalysis evidence in DUII controlled substance cases and determined that it will not require quantitative urine test results in such cases. Moreover, the testimony and concerns addressed before the legislature clearly evidences the understanding that the results of urine tests obtained under the statute can be used to prosecute DUII cases.[6] In light of the legislature's intent, we conclude that the trial court's admission of the urinalysis evidence was not error.

Affirmed.

---

[6] In *State v. Tripathi*, 226 Or App 552, 204 P3d 134 (2009), we held that the legislature, in amending ORS 813.131 in 1999 to provide that "[a] chemical analysis of a person's urine under this section shall be performed by an accredited or licensed toxicology laboratory" did not intend to eliminate otherwise applicable foundational requirements for the admission of scientific evidence. Our ruling in this case decides a different issue: whether the amendment to ORS 813.131 requires a quantitative test before urinalysis test results are admissible in a DUII controlled substance case.